NATIONAL MEDICAL FINANCIAL SERVICES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National Medical Financial Services, Inc. v. Commissioner
Docket No. 7084-90.
United States Tax Court
T.C. Memo 1992-178; 1992 Tax Ct. Memo LEXIS 190; 63 T.C.M. (CCH) 2554; March 25, 1992, Filed *190 Decision will be entered for respondent P, an accrual basis taxpayer, declared bonuses for its two 50-percent owner employees in early March 1987. P deducted the bonuses as compensation for its 1986 taxable year. The bonuses have never been paid. Held, P is not entitled to deduct the bonuses for taxable year 1986 because P has not shown that payment of the bonuses was impracticable and the impracticability was unforeseeable as of Dec. 31, 1986. Sec. 1.404(b)-1T, Q&A 2(b)(2), Temporary Income Tax Regs., 51 Fed. Reg. 4321 (Feb. 4, 1986). John C. Knobelsdorf II, for petitioner. Elizabeth Chirich, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1986 in the amount of $ 23,706. The sole issue for decision is whether petitioner, an accrual basis taxpayer, may deduct for taxable year 1986 bonuses for its two 50-percent owners which were declared in early March 1987 but which have never been paid. As discussed below, we hold that petitioner may not deduct the bonuses for 1986 because the requirements of section 1.404(b)-1T, Q&A-2(b)(1), Temporary *191 Income Tax Regs., 51 Fed. Reg. 4321 (Feb. 4, 1986), have not been met. All section references are to the Internal Revenue Code in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner is a corporation whose principal place of business was Houston, Texas, when the petition was filed. Petitioner is an accrual basis taxpayer in the business of renting and selling medical equipment to doctors and home care patients. During all times relevant to this case, Clifford Carroll and William McLucas, unrelated parties, each owned 50 percent of petitioner's stock and also served as corporate officers and directors. The business was founded in 1983 by Mr. McLucas and Mr. Carroll, and a third individual, Mr. Newman. Mr. Newman left the business in 1984 or 1985. Petitioner provided oxygen therapy equipment to home health care patients, as prescribed by physicians. The therapy included sending a certified respiratory therapist to the patient's home. A large portion of petitioner's income was derived from Medicare *192 and Medicaid payments. About 80 percent of the revenues were from Medicare and 10 percent from Medicaid. Petitioner began deriving income from Medicare claims before 1986. Assembling, making, and receiving payment on Medicare and Medicaid claims was a lengthy process. The amount of time required to receive payment on claims varied somewhat over the years. Payment sometimes took up to 5 or 6 months after the service was performed. Medicare paid 8-percent interest on late payments. Before making a claim, petitioner was required to assemble various material to support the claim and then to seek payment from the intermediary administering Medicare claims in the State in which the service was performed. Petitioner began to use a billing service, Far West, to help to obtain faster payments. Far West electronically transmitted claims to the Medicare intermediary. Financial statements for petitioner were prepared for petitioner's owners by a certified public accountant (C.P.A.), Ms. Kaitlyn Sharp, based on a compilation of company records. She performed the compilation and produced the financial statements 2 to 2 1/2 months after the end of the quarter covered by the report. For *193 example, her report for the quarter ending December 31, 1986, was dated March 12, 1987. During some of these years, including 1986 and 1987, petitioner delayed payment of some of its accounts payable by up to 6 to 12 months. For example, an obligation for some equipment acquired in 1984 and due in 1987 was still owing as of October 31, 1991, and a 3-year lease from 1987 was not fully paid by 1990. Petitioner was pressured for payments from creditors. When faced with demands for payment, Mr. McLucas negotiated with creditors to extend or reduce the payments or to otherwise resolve the matter. This helped petitioner to build a cash reserve. Mr. McLucas has not been able to obtain bank loans for petitioner, to find a bank that will lend money on petitioner's Medicare receivables, or to find a business that will buy its Medicare receivables. Petitioner's current assets exceeded or were (less than) current liabilities on the dates shown as follows: December 31, 1985
$ (21,520.78)
December 31, 1986
(31,736.50)
March 31, 1987
44,528.18 September 30, 1987
175,922.12 December 31, 1987
(4,430.40)
Mr. McLucas was paid $ 60,000 per year during 1986 and 1987, and $ 90,000 *194 per year from 1988 through October 31, 1991. 2. The Bonuses for Petitioner's Owners
In 1986 Mr. McLucas and Mr. Carroll began discussing payment of a bonus based on 75 percent of petitioner's profit for 1986. Petitioner's C.P.A. was aware of these discussions. In February or early March of 1987 petitioner's two owners, upon review of preliminary financial statements for the quarter ending December 31, 1986, declared bonuses of $ 39,041.91 each for themselves. The bonuses totaled $ 78,083.82, based on 75 percent of petitioner's net income before taxes for 1986. The C.P.A. told the owners that the bonuses should be paid; that, to be deductible for 1986, the bonuses should be paid within 2-1/2 months of the end of 1986; but that there were some exceptions permitting later payment if payment could not be made within that time. On March 12, 1987, the final financial statement for the quarter ended December 31, 1986, was redone to include the bonuses. Petitioner's C.P.A. treated the bonuses as a long-term obligation of petitioner beginning with the financial statement for the quarter ending December 31, 1986, and in each report thereafter until the statement for the period *195 ending December 31, 1987, which is the latest financial statement in evidence. Petitioner's C.P.A. classified an obligation as long term if it will be paid in more than 1 year. She accounted for it as a long-term liability because of her belief that short-term/outside creditors should be paid first because they can force a business to close. The bonuses have not been paid in whole or in part as of October 31, 1991, and have never been reported by Mr. Carroll or Mr. McLucas on their individual income tax returns. 3. Petitioner's Purchase of Physician's Reference Laboratories, Inc.
Around 1985, Mr. McLucas desired to diversify petitioner's business beyond the oxygen equipment services. One reason was to reduce the amount of traveling he did. Another was that he concluded that diversification would be sound from a business standpoint. Mr. McLucas became aware of a Houston area blood and medical testing lab, Physicians Reference Laboratories, Inc. (PRL), in 1985. To expand petitioner's business, in the middle of 1986 Mr. McLucas began serious negotiations to purchase PRL. Mr. McLucas thought the long-term potential for growth in the lab was better than for the oxygen *196 equipment services. PRL's share of the Houston market had dropped significantly. PRL formerly had 80 percent of the business from Houston, but it had declined to less than 10 accounts. Mr. McLucas visited other labs for comparison, and he had gained financial experience. He believed he could restore PRL's business and operate it successfully because of his and petitioner's expertise in the medical field. Petitioner initially negotiated with the owner. He was asking $ 500,000 for the business, which Mr. McLucas thought was too expensive. The owner died. Petitioners purchased PRL from the owner's estate in early 1987. Mr. McLucas obtained two independent reports or appraisals of PRL's assets around March 1987. They estimated that the value of the equipment purchased from PRL by petitioner was greater than or equal to petitioner's cost for PRL. One of the appraisers estimated that the value of PRL's assets purchased by petitioner was $ 52,000. Negotiations for the purchase were finished in March of 1987. On March 19, 1987, petitioner deposited $ 10,000 in an escrow account to be used to buy PRL. On April 1, 1987, petitioner acquired PRL for $ 71,600. Petitioner acquired *197 PRL's assets, including accounts receivable. As part of the purchase price, to be deducted therefrom, petitioner assumed PRL's liabilities totaling $ 58,326.96. Petitioner needed cash to rebuild PRL after buying it. Mr. McLucas discovered that the billing system was in disarray and the quality of its work had dropped. Mr. McLucas brought in new personnel and started fully electronic billing to get claims paid faster and to avoid using an outside billing service. In mid-April 1987 a bank account was opened at Texas Commerce Bank for PRL. By September 1987, petitioner had transferred $ 154,736.26 from its checking account at Promenade National Bank to PRL's account at Texas Commerce Bank for PRL's operating expenses. PRL is now more profitable to petitioner than the home oxygen equipment business. It has grown significantly, fivefold or more since 1987. Mr. McLucas believes it is now the largest medical laboratory in Houston. 4. Petitioner's Investments
Petitioner's balance sheets show investments in the following amounts: December 31, 1985
-0-  September 30, 1986
$ 8,983.27
December 31, 1986
92,083.27
March 31, 1987
102,083.27
December 31, 1987
100,333.27
*198 Petitioner invested about $ 50,000 in a franchise right relating to a computer game called VCR Quarterback, probably in 1986. This may be included in petitioner's investments for the last quarter in 1986. Petitioner's financial statement for the period ending December 31, 1986, shows as an asset cash of $ 217,565.43. In December 1986, petitioner bought 4,400 shares of Allwaste stock for $ 24,718.11. On January 15, 1987, petitioner deposited $ 100,000 from its checking account to a 14-day certificate of deposit (CD). The CD bore interest of 5.8 percent and was automatically renewable. Mr. McLucas renewed the CD a couple of times until approximately March 1987. At that time he rolled the cash from the CD back into petitioner's checking account. On March 26, 1987, petitioner bought and sold 1,000 shares of ConRail stock. The settlement date for this purchase and sale was April 2, 1987. Petitioner sold the 4,400 shares of Allwaste stock in April 1987. In April petitioner bought 1,500 shares of Browning Ferris Industries stock for $ 41,835.42, which petitioner sold on June 7, 1987, for $ 42,899.51. The proceeds of the sale were moved into a money market fund and used in part *199 in October 1987, to buy stock in Critical Industries for $ 8,250. On October 20, 1987, petitioner bought 500 shares of Compaq Computer Corp. stock for $ 26,661.17 ($ 52.75 per share) on the advice of a stockbroker Mr. McLucas trusted. Petitioner sold the stock later that day for $ 22,436.85 ($ 45.25 per share). The stock had been selling for $ 65 per share a few days before October 20, 1987. Petitioner's financial statement for the quarter ending December 31, 1987, shows investments of $ 100,333.27 and cash of $ 79,846.06. In July 1988 petitioner bought 3,000 shares of Oneita Industries stock for $ 20,625. In March of 1989, petitioner bought 7,000 shares of Scientific Measurement Systems, Inc. stock for $ 10,736.53. In June of 1989 petitioner sold the 3,000 shares of Oneita Industries stock for $ 29,342.23, and bought 4,000 shares of Kinetic Concepts, Inc., for $ 24,160. In October of 1989 petitioner purchased 400 shares of Swift Energy Company stock for $ 4,250. On December 29, 1989, petitioner sold the 7,000 shares of Scientific Measurement Systems stock for $ 5,005 and the 1,500 shares of Critical Industries, Inc. stock for $ 5,010. In February 1990, petitioner sold 4,000 *200 shares of Kinetic Concepts, Inc. stock for $ 25,500, and bought 1,000 shares of Growth Fund of Spain for $ 12,317.87. In June of 1990 petitioner bought 1,000 shares of Benchmark Electronics stock for $ 8,750 and 200 shares of Sundowner Offshore Services, Inc. stock for $ 1,800. In August of 1990 petitioner sold the 200 shares of Sundowner Offshore Services, Inc. stock for $ 2,452, and purchased 1,500 shares of Kelley Oil Corp. stock for $ 16,702.50. As of September 30, 1991, petitioner held 1,000 shares of Benchmark Electronics, Inc. stock, 1,000 shares of Growth Fund of Spain, Inc. stock, 1,500 shares of Kelley Oil Corp. stock, and 400 shares of Swift Energy Co. stock. All stock positions described above and money market investments held by petitioner were liquid investments. Petitioner had $ 89,000 in cash in October 1991, around $ 180,000 in short-term payables, and some stock. Petitioner's current financial statement is not in evidence. OPINION 1. Background
Section 404(a) provides that compensation paid or accrued on account of any employee under a plan deferring receipt of such compensation, if otherwise deductible, is deductible subject to limitations set forth *201 in that section. Section 404(a)(5) provides that compensation paid under a nonqualified plan of deferred compensation is deductible in the taxable year in which it is included in the gross income of employees participating in the plan. Generally speaking, the effect of this section is to deny an accrual basis taxpayer a deduction for accrued compensation until the employee receives and reports it. However, an exception is provided under certain circumstances if the accrual basis taxpayer defers payment of the compensation. Sec. 1.404(b)-1T, Q&A-2(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4321 (Feb. 4, 1986). We recently held that section 1.404(b)-1T, Temporary Income Tax Regs., supra, is valid. Truck and Equipment Corp. of Harrisonburg v. Commissioner, 98 T.C.     (1992). Section 1.404(b)-1T, Q&A-2(b)(1), Temporary Income Tax Regs., supra, provides in part that: (b)(1) A plan, or method or arrangement, shall be presumed to be one deferring the receipt of compensation for more than a brief period of time after the end of an employer's taxable year to the extent that compensation is received after the 15th day of the 3rd calendar month *202 after the end of the employer's taxable year in which the related services are rendered ("the 2 1/2 month period"). * * *
Section 1.404(b)-1T, Q&A-2(b)(2), Temporary Income Tax Regs., supra, generally allows deferral of payment of compensation for more that 2-1/2 months beyond the end of the employer's taxable year if the employer proves that: (1) It was administratively or economically impracticable to avoid the deferral (e.g., if payment would jeopardize the employer's solvency, or it was not reasonably possible to determine within the 2 1/2 months whether payment of such amount was to be made), and (2) the circumstances causing the deferral were unforeseeable at the close of the employer's taxable year. Section 1.404(b)-1T, Q&A-2(b)(2), Temporary Income Tax Regs., supra, provides in part that: (2) The taxpayer may rebut the presumption established under the previous subparagraph with respect to an amount of compensation or benefits only by setting forth facts and circumstances the preponderance of which demonstrates that it was impracticable, either administratively or economically, to avoid the deferral or the receipt by an employee of the amount of compensation *203 or benefits beyond the applicable 2 1/2 month period and that, as of the end of the employer's taxable year such impracticability was unforeseeable. For example, the presumption may be rebutted with respect to an amount of compensation to the extent that receipt of such amount is deferred beyond the application 2 1/2 month period (i) either because the funds of the employer were not sufficient to make the payment within the 2 1/2 month period without jeopardizing the solvency of the employer or because it was not reasonably possible to determine within the 2 1/2 month period whether payment of such amount was to be made, and (ii) the circumstance causing the deferral described in (i) was unforeseeable as of the close of the employer's taxable year. * * *
Section 1.404(b)-1T, Q&A-2(c), Temporary Income Tax Regs., 51 Fed. Reg. 4322 (Feb. 4, 1986), provides in part that: (c) A plan, or method or arrangement, shall not be considered as deferring the receipt of compensation or benefits for more than a brief period of time after the end of the employer's taxable year to the extent that compensation or benefits are received by the employee on or before the end *204 of the applicable 2 1/2 month period. * * *
2. Impracticability or Inability to Pay the Bonus
We first decide whether petitioner has shown that it was administratively or economically impracticable to make the payment by March 15, 1987. Sec. 1.404(b)-1T, Q&A 2(b)(2), Temporary Income Tax Regs., 51 Fed. Reg. 4321 (Feb. 4, 1986). Petitioner argues that it was required by good business judgment to retain cash and liquid investments. Petitioner also argues that it purchased PRL to establish a more stable business and that PRL required an unforeseeable amount of cash. Petitioner argues that the cash needs of PRL caused petitioner to be insolvent at times, and paying the bonuses would have caused a greater insolvency. Mr. McLucas understood that the bonus should be paid when the company can afford it, and testified that has always been his intention. Respondent argues that petitioner could have paid the bonuses if it so desired because on December 31, 1986, petitioner had a cash balance of $ 217,565 and investments of $ 92,083; but instead, early in 1987 petitioner chose to make more investments and to purchase PRL. Petitioner argues that PRL is now more *205 profitable than the oxygen equipment services, and that petitioner made sound business decisions to have cash, to make investments, and to diversify. Petitioner awarded but did not pay the bonuses, thus saving $ 23,706 in tax. Petitioner used its funds to make investments, diversify, and maintain and increase petitioner's owners' salaries. We conclude that petitioner has not demonstrated impracticability as required by section 1.404(b)-1T, Q&A 2(b)(2), Temporary Income Tax Regs., supra. We believe petitioner could have chosen to pay the bonuses and spend less on these other items consistent with those standards. It also does not demonstrate a threat to solvency, as used in the regulations as an example of both impracticability and inability to pay. 3. Unforeseeability of the Claimed Inability to Make the Payment
Even if petitioner had shown that payment of the bonuses was impracticable, petitioner would also be required to show that the claimed impracticability was unforeseeable. Sec. 1.404(b)-1T, Q&A 2(b)(2)(ii), Temporary Income Tax Regs., 51 Fed. Reg. 4322 (Feb. 4, 1986). We conclude that it was not. Petitioners argue that their cash needs were *206 unforeseeable because of slow Medicare/Medicaid payments. We disagree. Petitioner experienced late Medicare payments before 1986. We are not convinced the collection situation was unforeseeable by petitioner. Petitioner argues that it was expected and planned that PRL would recover quickly after being purchased by petitioner, and that the cash needs of PRL were unforeseeable. We disagree. We believe the advantage of diversifying by buying PRL were known to petitioner in 1986, and that the cost of rebuilding PRL was reasonably foreseeable. Mr. McLucas testified that home health services are a marginal business, and that their home health operation has been and is in trouble because of past and pending legislative and regulatory changes. He also testified that he considered reducing his salary the day before the trial; that he may be forced to sell stock held by petitioner to pay creditors after the trial; and that PRL's accounts receivable purchased by petitioner and PRL's electronic billing were not nearly as good as he had expected. However, there is nothing in the record to corroborate this testimony. We find it to be unpersuasive. The bonuses were awarded but not paid, *207 and immediately classified as long-term liabilities. We conclude that petitioners foresaw that the bonuses would not be paid when awarded, and that unforeseeable events have not caused the bonuses to remain unpaid. Decision will be entered for respondent.